THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
RONALD E. PICKENS, Defendant-Appellant.

First District (1st Division)  No. 77-897

Opinion filed August 14, 1978.

James J. Doherty, Public Defender, of Chicago (Robert T. Badesch, Assistant Public Defender, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger, Renee Goldfarb, and Richard D. Heytow, Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE GOLDBERG delivered the opinion of the court:

After a bench trial, Ronald Pickens (defendant) was found guilty of murder (Ill. Rev. Stat. 1973, ch. 38, par. 9—1(a)(3)), and two counts of armed robbery (Ill. Rev. Stat. 1973, ch. 38, par. 18—2). The defendant was sentenced to concurrent terms of 20 to 35 years for murder and 4 to 6 years for each of the armed robberies.

On appeal defendant contends the trial court committed reversible error by admitting into evidence written hearsay in the form of a police artist's suspect sketch. The defendant further contends he was not proved guilty beyond a reasonable doubt of armed robbery or murder. The State contends the defendant waived error regarding the sketch by failing to object at trial; any error which might have occurred was harmless; and the defendant was proved guilty of armed robbery and murder beyond a reasonable doubt.

The widow of the murder victim testified she and her husband returned home shortly after midnight on May 11, 1975. The lights on the block were turned on that evening. As they began to walk toward their townhouse on South Drexel Avenue, in Chicago, a black male passed them. This man was about 6 feet tall, slim, and wearing a short black leather jacket, black pants, a multicolored shirt and maroon cap. The deceased and this man exchanged greetings and the man passed them. Suddenly the witness felt a heavy object on the back of her neck. She turned around and saw the same man, who announced a stickup and forced the couple into an alcove. The man took money from each of them. He then pointed to the witness and

announced that he wanted "some of that." He told the witness to "unbutton your clothes." As she began to comply, her husband struggled with the assailant. The witness heard three shots and her husband fell to the ground some 20 feet away. It was stipulated he died from gunshot wounds.

The widow screamed and a neighbor ran after the assailant but stopped to aid the deceased. The neighbor testified that he saw the back of the assailant who had a short Afro and long sideburns. The light in front of the townhouse was on. The widow further testified the police arrived moments after the shooting. She told them the assailant had keen features and sideburns, "and was dark and thin." The widow rode through the neighborhood with the police in search of the man but could not recall stopping during this drive. She was taken to Michael Reese Hospital where she viewed a suspect whom she was unable to identify as the assailant.

During the afternoon of that same day, the widow was seated in a car in front of her townhouse when she saw the assailant cross directly in front of the car. She notified the detectives of this incident. She also saw the assailant in early June 1975 at the corner of 47th Street and Drexel. She finally located police officers who told her to inform the detectives assigned to the case. Between May 11, 1975, and June 28, 1975, the widow viewed over 200 photographs but she did not identify the assailant from these pictures. In the early part of June 1975, she provided the police artist with details of the appearance of the assailant. The resulting sketch was prepared and received in evidence. On June 28, 1975, the widow was shown several additional photographs by the investigators assigned to the case. She identified the defendant from one of these pictures. She also identified the defendant from a lineup on June 30, 1975.

Police Investigator Francis Kehoe testified he and Officer John Kennedy were assigned to investigate the crime. They requested 75 photographs of individuals known to frequent the locale of the shooting and received 65 photographs. There were no photographs available of the remaining suspects. The widow did not identify the assailant from these 65 photographs. On June 26, 1975, Kehoe and Kennedy observed a group of young men standing on the 4700 block of Ingleside. One of the young men resembled the physical description of the assailant provided by the widow. The young man began to walk away from the group, was stopped by Kennedy and Kehoe, and identified himself as the defendant. Kehoe remembered then that defendant was one of the persons whose photo the police did not receive pursuant to their request. Kehoe requested that defendant accompany them to the station. Defendant did so but the police were unable to locate the widow for a possible lineup identification. Defendant suggested the officers take his picture. He denied that he was guilty of the crime. He said he could be located at Drake Manufacturing Company, his place of employment. Defendant then left the station.

On June 28, 1975, the widow identified the defendant from this photograph, which was shown to her with seven others. On June 30, 1975, Kehoe and Kennedy went to Drake Manufacturing Company where they learned defendant had been fired six months earlier. Later the same day they saw a group of people at 48th Street and Drexel. They walked toward the group and saw defendant stooping behind several of the individuals. The defendant was advised of his rights and placed under arrest.

In his testimony, the defendant denied owning a gun, robbing the couple or shooting the deceased. The defendant stated that on May 10, 1975, he and several friends spent the afternoon together. At about 10 p.m. they began shooting dice at the corner of 48th Street and Ingleside. This continued until 12:10 the morning of May 11, 1975. About that time a police car carrying two officers and a young woman approached the corner. The defendant stated he was called over to the car, where he was asked to say, "[T]his is a stickup. Give me your money." The young lady, whom defendant identified as the widow, shook her head negatively after this phrase and the defendant was allowed to leave. Defendant testified that he was wearing a "beige-white panama straw hat." On cross-examination the defendant acknowledged his employment at Drake Manufacturing Company was terminated six months prior to the arrest in this case.

Eric Wren testified that on May 11, 1975, he was shooting dice with the defendant and several other friends at 48th Street and Ingleside. He could not remember what day of the week this was nor when he told the defense attorney about defendant's presence on the corner. He recalled a police car approaching the corner at about 12:30 a.m. but stated he ran away for 10 minutes and did not see the exchange between defendant and the occupants of the car. He stated he then returned to the corner and was with the defendant until 1 a.m. But, another witness, Tyrone Smith, testified that Eric Wren did not return to the corner after the police car left.

Tyrone Smith, the defendant's friend for 9 years, stated he, the defendant, Wren and several others were playing dice at 48th Street and Ingleside from 10 p.m., May 10, 1975, to after midnight on May 11, 1975. At 12:30 a.m. a police car with two officers and a young black woman arrived at the corner. He saw the defendant speak with the parties in the police car. Defendant was wearing "a straw hat." He, the defendant and other members of the group stopped together at a liquor store at about 12:40 a.m. He did not tell anyone until three months later about being with defendant that night.

Rosalind Hawkins, the defendant's girlfriend, substantially duplicated the testimony of Wren and Smith concerning the dice game and the visit by the squad car. She stated the young lady seated in the police car had reddish blond hair pinned up in the back.

Michael Pickens, the defendant's brother, testified he was with several

friends on the evening of May 10, 1975, and early morning hours of May 11, 1975. At 12:10 a.m. on May 11, 1975, he and a friend were driving away from an apartment at 48th Street and Drexel. When they passed 48th Street and Ingleside the witness saw his brother (defendant) playing dice on the corner. When they continued to drive they saw a man named Terrell Huntley run across the park with a gun. Huntley jumped into the car and stated he had just shot someone. He asked Michael Pickens and his companions not to repeat his statement. He requested that they drive him home, where he dropped off his gun. The witness stated Terrell Huntley was thin, had sideburns, and was wearing a leather jacket. The witness testified he and his friends went to a discotheque and then drove to Kankakee on May 11, 1975, and posted bail of $200 for a friend. On rebuttal by the State the parties stipulated the friend in jail in Kankakee was released on May 13, 1975. On surrebuttal the witness recalled he did not post bond on May 11, 1975, but merely visited with the friend who was released the second time they saw him. The parties also stipulated the widow would testify her hair was not pinned up and was dark brown in color on May 11, 1975.

Defendant first claims reversible error when the trial court admitted a sketch of the suspect prepared by a police artist pursuant to information from the widow. It is defendant's theory that this "sketch constituted impermissible written hearsay evidence." (*People v. Fair* (1977), 45 Ill. App. 3d 301, 305, 359 N.E.2d 848, and authorities there cited.) We agree with defendant's theory as an abstract principle of law but the principle is not applicable here.

No objection of any kind was ever made by defendant to the sketch. Defendant's counsel made no objection when the sketch itself was identified by the widow; when the sketch was introduced in evidence and when the prosecutor mentioned the sketch in his closing argument. In fact, counsel for the defendant himself used the sketch in cross-examination of the widow. In addition, in his closing argument he invited the trial court to examine the sketch. Counsel for defendant pointed out a spectator in the courtroom and suggested that the sketch meant nothing because it also resembled this spectator.

■ ■ ■ In the absence of any objection by the defense, we have here an attempt to raise the issue for the first time in this court. The point therefore is deemed waived. (*People v. Howell* (1975), 60 Ill. 2d 117, 120-21, 324 N.E.2d 403; *People v. Studdard* (1972), 51 Ill. 2d 190, 197-98, 281 N.E.2d 678.) In addition, the use of the hearsay material by defendant's counsel in cross-examination and final argument "precludes him from raising that matter on appeal." *People v. Jenkins* (1974), 20 Ill. App. 3d 727, 734, 315 N.E.2d 269, and cases there cited.

■■ Furthermore, "In a bench trial it is presumed that the trial judge has

considered only competent evidence in reaching his verdict." (*People v. Gilbert* (1977), 68 Ill. 2d 252, 258, 369 N.E.2d 849, and cases there cited.) Since this presumption "may be rebutted where the record affirmatively shows the contrary * * *" (*Gilbert*, 68 Ill. 2d 252, 258-59), we turn again to the record. The trial judge mentioned the fact of preparation of the sketch, as distinguished from the sketch itself, only once. In reviewing the evidence given by the widow, the trial court simply stated, "She went and had a drawing made." As shown, no objection was made to the sketch when it was received in evidence. These factors completely differentiate the case before us from *Fair*. There, this court held that the presumption that the trial court considered only competent evidence was "rebutted by the fact that the trial court admitted the sketch into evidence over the objections of defense counsel." (*Fair*, 45 Ill. App. 3d 301, 306.) We find no reversible error in this regard.

Defendant next urges that he was not proved guilty beyond a reasonable doubt. As appears from the above summary of the evidence, the identifying witness had an excellent opportunity of viewing the offender. She saw him briefly when she and her deceased husband passed him on the walk. She saw him again when she turned around after being stopped by him. When the defendant ordered her to remove her clothes she turned and was able to view his face from a close position. Also, her testimony, supported by her neighbor who chased the suspect, is that there were lights in the area, all of which were on. The widow saw the man she identified two times on the street after commission of the crime. The neighbor appeared after he heard the shots and chased the fleeing suspect for a short distance. He partially corroborated the testimony of the widow as he saw that the person he chased had rather short hair and long sideburns. The evidence also shows that the identifying witness, the widow, viewed many pictures before she selected that of the defendant some six weeks after the crime. She also identified the defendant at a subsequent lineup. No legal attack is made by defendant against the photographic identification or the lineup.

■■ The defendant attacks this identification testimony as being factually insufficient. We disagree. We agree with the statements made by the trial judge at the conclusion of all of the evidence. He described the identifying witness as very convincing, very intelligent and as a very honest type of witness. He described her testimony as trustworthy, convincing and credible. He pointed out the care that the witness used in examining many photographs before identifying that of the defendant. In a situation of this type, the courts have repeatedly held that where a credible witness has viewed the accused under circumstances which would permit a positive identification, the testimony of that single witness is sufficient to sustain a conviction even though it is contradicted by the accused. (*People v.*

*Yarbrough* (1977), 67 Ill. 2d 222, 367 N.E.2d 666; *People v. Jones* (1975), 60 Ill. 2d 300, 307-08, 325 N.E.2d 601.) In our opinion, the testimony of the identifying witness in the case before us was not doubtful or vague but was clear, convincing and credible beyond reasonable doubt.

■■ Defendant points out that on cross-examination the widow testified that she could not remember whether the police car that she was in on the night of the murder stopped while searching for suspects in the neighborhood. However, the only persons who testified concerning this incident were defendant and his alibi witnesses. Defendant urges the presence of such possible discrepancies in the testimony of the widow and her failure to make an identification until six weeks after the event. In this type of situation the courts of Illinois have adhered to the view that precise accuracy in description of the offender by an identifying witness is not a necessity. Even such matters as the failure of a witness to note and report a clearly visible facial characteristic do not serve to eliminate the validity of the identification but go solely to the weight of the evidence and are matters of credibility only. *People v. Hunt* (1975), 34 Ill. App. 3d 472, 478, 340 N.E.2d 203, *appeal denied* (1976), 62 Ill. 2d 590; *People v. Sanford* (1975), 34 Ill. App. 3d 485, 488-89, 340 N.E.2d 255, *appeal denied* (1976), 62 Ill. 2d 591.

Defendant also urges the strength and sufficiency of the alibi testimony as given by defendant himself and by a number of other witnesses. As above shown, the defendant did produce several witnesses whose testimony tended to support his alibi that at the time of the commission of the crime defendant was engaged in a dice game on a street corner. In this regard it should also be be noted that there were contradictions inherent in the testimony of some of these witnesses. In addition, one of them was defendant's brother. The others were friends of defendant who had known him for some time. With reference to these witnesses, the trial court pointed out that he had carefully observed their demeanor and their testimony was "a little too pat, a little too contrived and a little too self-serving." The trial court expressly stated that he would not put the same stamp of credibility on their testimony as he did on that of the widow.

■■ In weighing alibi testimony, it must be remembered that it is sufficient if the defense raises a reasonable doubt of the presence of defendant at the time and place of the crime. "The burden of proof was on the State to prove the defendant guilty of such offenses beyond a reasonable doubt." *People v. Brown* (1972), 52 Ill. 2d 94, 105, 285 N.E.2d 1, and cases there cited.

In a situation of this type we are obliged to follow the long accepted principle that, "There is no obligation on a trial court to believe alibi testimony over positive identification of an accused, even though given by a greater number of witnesses." *People v. Jackson* (1973), 54 Ill. 2d 143, 149,

295 N.E.2d 462, citing *People v. Catlett* (1971), 48 Ill. 2d 56, 64, 268 N.E.2d 378. See also *People v. Therriault* (1976), 42 Ill. App. 3d 876, 885, 356 N.E.2d 999, *appeal denied* (1977), 65 Ill. 2d 579.

■■ Upon examination of this record, we conclude that the identification testimony was strong and convincing beyond a reasonable doubt. In our opinion, the alibi testimony has failed to create a reasonable doubt of guilt. This record presents simply an issue of credibility which it was the function of the trial judge as trier of fact to resolve. "Where the evidence is merely conflicting a court of review will not substitute its judgment for that of the trier of fact." (*People v. Akis* (1976), 63 Ill. 2d 296, 298-99, 347 N.E.2d 733.) The judgment is accordingly affirmed.

Judgment affirmed.

O'CONNOR and BUCKLEY, JJ., concur.