THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
RICHARD SKORKA, Defendant-Appellant.

First District (3rd Division)   No. 85—2559

Opinion filed September 17, 1986.

Edward D. Stern and William A. Swano, both of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Thomas V. Gainer Jr., and James E. Fitzgerald, Assistant State's Attorneys, of counsel), for the People.

JUSTICE McNAMARA delivered the opinion of the court:

Defendant, Richard Skorka, was indicted for two counts of murder in 1980, but continually has been found to be unfit to stand trial. In 1985, a discharge hearing was held pursuant to section 104—25 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1985, ch. 38, par. 104—25), to determine if defendant was sane at the time he committed the offenses. Defendant was found to be sane at the time of the crime and was remanded for an extended treatment period of five years. Defendant appeals that order, contending that the trial court applied the incorrect burden of proof on the issue of sanity; that the State failed to prove beyond a reasonable doubt that defendant was sane at the time of the commission of the crimes; and that defendant was denied a fair hearing because the State improperly cross-examined expert witnesses.

On April 11, 1980, Gary Sergo and Robert Sneddon were shot and killed. On April 21, 1980, defendant and Scott Kroll were indicted for those murders. Defendant was found not fit to stand trial, and was remanded to the Department of Mental Health for treatment.

At the hearing, the State's stipulated evidence established that the victims were found dead at 8:30 a.m. on April 11, 1980, as a result of shotgun wounds. The stipulated testimony of George Sarna revealed that at 5:30 a.m. on that day, defendant and Kroll came to his home and asked Sarna to store two shotguns in the crawlspace of his home, which he did. The three men then drove to work, and in the car defendant said Sarna did not want to know what the guns were used for. At work, defendant asked Sarna to destroy the guns because the plant security police were looking for defendant. Defendant was arrested that afternoon. He admitted being present outside of the home where the shooting occurred, but stated that Kroll told him about the shooting when Kroll emerged from the victims' home. Five hours later, defendant admitted murdering the two victims. Two hours later, defendant made the same admission in an

interview with an assistant State's Attorney, and that statement was subsequently reduced to writing and introduced into evidence at the hearing. The two shotguns were found in the crawlspace in Sarna's home.

On November 19, 1980, Dr. Melvin Seglin, a psychiatrist, examined defendant. He also reviewed defendant's psychiatric reports, police reports and defendant's confession. The examination revealed that defendant remembered shooting the first victim, but not the second victim. Defendant stated to Dr. Seglin that he had a dispute with the victims and believed they had taken his wallet. Dr. Seglin concluded that at the time of the murders defendant was suffering from acute paranoid schizophrenia with persecutory grandiose delusions, auditory hallucinations, alcohol abuse and borderline personality disorder. Dr. Seglin testified at the hearing that defendant was unable to conform his conduct to the requirements of the law and was insane at the time of the crime.

On cross-examination, Dr. Seglin was asked whether defendant had stated in the examination that he had attempted to set up an alibi prior to the murders. Defense counsel objected on the basis that no facts regarding defendant's establishing a false alibi were in evidence. The State responded that the relevant facts would be established in rebuttal. Dr. Seglin was allowed to answer the question, and he stated that defendant had not given him any information regarding an alibi, but repeated his opinion that defendant could not conform his conduct to the law. Dr. Seglin then agreed that hiding the guns and asking his co-worker to destroy the murder weapons evidenced defendant's appreciation of the criminality of his conduct at that time. On redirect, Dr. Seglin said that, even considering facts about defendant's establishing a false alibi or hiding the weapons, he still believed defendant could not appreciate the criminality of his conduct. Dr. Seglin also stated that defendant was not malingering at the time of the examination.

Dr. Frederick Gibbs, an expert in the field of EEG, testified that he conducted an alcohol-induced EEG on defendant on August 11, 1980. The results were abnormal, indicating a mild localized depressive reaction to injury in the right frontal temporal area. Dr. Gibbs opined that defendant had a pathological reaction to alcohol.

Dr. Jerome Katz, a psychiatrist, examined defendant on April 3, 1981. He testified that defendant was schizophrenic and suffered from organic brain disease, as evidenced by the EEG. Consequently, defendant lacked substantial capacity to conform his conduct to the law at the time of the crime. Dr. Katz also was of the opinion that

defendant was not malingering at the time of the examination. On cross-examination, when asked whether defendant's attempt to set up a false alibi would indicate he could appreciate the criminality of the offense, Dr. Katz replied, "Possibly." He then reemphasized his opinion that at the time of the shooting he believed defendant could not appreciate the criminality of his conduct.

In May 1981, defendant was examined by Marvin Pitluk, a psychologist. The examination revealed that defendant abused drugs and alcohol. Psychological tests indicated that defendant was of average intelligence, showed extremely poor judgment under stress, had signs of pathology, was alienated, deficient in insight and understanding of himself, was abnormally concerned with murder, suicide and cannibalism, and had some indication of having crude and primitive drives. Pitluk concluded that defendant was mentally ill at the time he committed the murders, and lacked substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law.

Dr. Albert Stipes, a psychiatrist employed by the Psychiatric Institute of the circuit court of Cook County, testified in rebuttal for the State. Dr. Stipes examined defendant several times between 1982 and 1984, and reviewed the relevant police reports, statements made to the police, psychological tests, and Institute records. Dr. Stipes stressed that he believed defendant manifested some form of malingering. He found defendant was a schizophrenic, paranoid type. Dr. Stipes further testified that the organic brain problem indicated by the EEG could be caused by any type of illness including encephalitis, alcohol or drug abuse. Dr. Stipes concluded that defendant was legally sane at the time of the crime, understood right from wrong and was able to conform his conduct to the requirements of the law.

The record also includes various psychiatric reports concerning defendant. These records were reviewed by Dr. Stipes. On January 27, 1982, a placement staffing report states that during an examination "it was not apparent whether [defendant] was deliberately feigning unfitness [to stand trial]. *** It did appear that he may well be malingering in order to avoid going to trial. *** He does seem to be malingering when he gives answers to questions that are designed to demonstrate he remains unfit. He is apparently attempting to insure that he is not sent to prison, an event which he fears." On February 11, 1982, a psychiatrist's evaluation of defendant states: "Regarding competency it seems that he has been answering the questions about the court the wrong way on purpose to

avoid appearing in court. *** He said he was answering me wrong on purpose."

In regard to the burden of proof, the State argued that it had "sustained a burden of proof." Defense counsel stated that the "standard at this time is whether or not the State made out their case in terms of proof beyond a reasonable doubt" and that the defense had "sufficiently raised an issue of insanity." The court responded: "I do not believe you have made up your defense of insanity. Not that you have to make it up, but I believe Dr. Stipes and my own observation of the defendant over a long period of time, that I do not believe defendant was insane at the time ˙of the incident ***." The court found that defendant was sane at the time the murders were committed. When defense counsel stated that defendant would appeal, the court replied, "Okay. The State has the burden."

■■■ Defendant initially contends that the trial court used the wrong standard of proof, erroneously placing the burden on defendant. At the time the crime was committed in 1980, the law stated that when a defendant introduces evidence sufficient to raise the affirmative defense of insanity, the State carries the burden of proving beyond a reasonable doubt that defendant was sane at the time of the offense. (Ill. Rev. Stat. 1979, ch 38, par. 3—2; *People v. Silagy* (1984), 101 Ill. 2d 147, 461 N.E.2d 415, *cert. denied* (1984), 469 U.S. 873, 83 L. Ed. 2d 156, 105 S. Ct. 227.) The legislature changed this burden, effective January 1, 1984: "When the defense of insanity has been presented during the trial, the burden of proof is on the defendant to prove by a preponderance of the evidence that the defendant is not guilty by reason of insanity." (Ill. Rev. Stat., 1984 Supp., ch. 38, par. 6—2(e).) Despite the fact that the hearing took place after January 1, 1984, the applicable standard is governed by prior law. A shift in the burden of proof relating to the insanity defense would be an *ex post facto* law if it were applied to the trial of an offense which was committed prior to the amendment of the law. (*People v. Hickman* (1986), 143 Ill. App. 3d 195, 492 N.E.2d 1041; *People v. Hollins* (1985), 136 Ill. App. 3d 1, 482 N.E.2d 1053.) In the present case, the State admitted in closing argument that it had the burden of proof, and argued that it had sustained that burden. Defense counsel pointed out in closing that the State had to sustain a burden of proof beyond a reasonable doubt, while the defense merely had to sufficiently raise the issue of insanity. The court's response that defendant had not "made up your defense of insanity— not that you have to make it up," merely referred to defendant's

lack of success in setting up the defense of insanity, and did not indicate defendant carried a burden of proving he was not guilty by reason of insanity by a preponderance of evidence under the new statute. The court then clarified that "[t]he State has the burden." Thus, we find the record shows that the trial court used the pre-1984 standard, which was in effect at the time of the offense, in determining whether defendant was sane when he committed the murders. Furthermore, the State did succeed, under the pre-1984 standard, in proving beyond a reasonable doubt that defendant was sane at the time he committed the murders.

The Criminal Code of 1961 defines insanity as follows:

> "Insanity. (1) A person is not criminally responsible for conduct if at the time of such conduct, as a result of mental disease or mental defect, he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law." (Ill. Rev. Stat. 1979, ch. 38, par. 6—2(a).)

In meeting its burden of proving defendant sane beyond a reasonable doubt, the State is not required to produce expert testimony. (*People v. Marshall* (1983), 114 Ill. App. 3d 217, 448 N.E.2d 969.) The trier of fact may reject expert testimony that a defendant was insane at the time of the offense and conclude that the defendant was sane solely on the basis of lay testimony. (114 Ill. App. 3d 217, 448 N.E.2d 969.) The trier of fact may also accept one expert's opinion over another on the question of insanity so as to resolve contradictions. (*People v. Clark* (1981), 102 Ill. App. 3d 414, 429 N.E.2d 1255.) Additionally, the trier of fact may consider defendant's statements and other facts in evidence, and reasonable inferences drawn from those facts, on the question of sanity. (102 Ill. App. 3d 414, 429 N.E.2d 1255.) For example, the existence of a plan or design for the perpetration of the crime is one fact having particular relevance on this question. (*People v. Meeker* (1980), 86 Ill. App. 3d 162, 407 N.E.2d 1058; *People v. Spears* (1978), 63 Ill. App. 3d 510, 380 N.E.2d 423.) Finally, whether the State has carried its burden is a question of fact, and the trier of fact's determination will not be reversed unless so improbable or unsatisfactory as to create a reasonable doubt as to defendant's sanity. *People v. Silagy* (1984), 101 Ill. 2d 147, 461 N.E.2d 415; *People v. Taylor* (1982), 110 Ill. App. 3d 112, 441 N.E.2d 1231.

In the present case, the trial court was not required to accept the testimony of defendant's expert witnesses over that of Dr. Stipes. Dr. Stipes conducted several examinations of defendant over

a period of three years, and reviewed all documents, including staff reports stating that defendant was malingering to avoid trial. Dr. Stipes stated that he found some evidence of malingering. Although he found that defendant suffered from mental illness, he stated that the indications of organic brain problems could be caused by any type of illness. Moreover, the fact that some mental illness exists, or that defendant's murdering two neighbors is bizarre and unusual behavior, does not constitute proof of legal insanity. (*People v. Silagy* (1984), 101 Ill. 2d 147, 461 N.E.2d 415; *People v. Marshall* (1983), 114 Ill. App. 3d 217, 448 N.E.2d 969.) Dr. Stipes concluded that defendant was able to appreciate the criminality of his conduct and was able to conform his conduct to the requirements of the law, and thus was sane at the time he committed the murders. While Dr. Seglin reached an opposite conclusion, he offered contradictory testimony about whether defendant's attempts to prevent detection of his crimes by hiding the weapons indicated that defendant did in fact appreciate the criminality of his acts. Dr. Katz' testimony was brief and sufficiently rebutted by Dr. Stipes. The psychological results Mr. Pitluk testified about were considered by Dr. Stipes in reaching his conclusion that defendant was sane. We cannot say, therefore, that the trier of fact's decision to place more weight on Dr. Stipes' testimony was incorrect. See *People v. Teague* (1982), 108 Ill. App. 3d 891, 439 N.E.2d 1066, *cert. denied* (1983), 464 U.S. 867, 78 L. Ed. 2d 179, 104 S. Ct. 206.

Additionally, Dr. Stipes' opinion that defendant was sane at the time he committed the murder was supported by other evidence. As noted earlier, the existence of a plan or design for a crime, and especially plans or methods for escape and prevention of detection or concealment of evidence of the crime, are factors relevant to a determination of defendant's sanity. (*People v. Teague* (1982), 108 Ill. App. 3d 891, 439 N.E.2d 1066, *cert. denied* (1983), 464 U.S. 867, 78 L. Ed. 2d 179, 104 S. Ct. 206; *People v. Spears* (1978), 63 Ill. App. 3d 510, 380 N.E.2d 423.) Defendant's driving to a friend's home to pick up the shotguns in response to his belief that the neighbors took his wallet showed a substantial plan to commit a crime. Defendant's efforts to hide the murder weapons and his wish to have the shotguns destroyed because security personnel were looking for him indicate that defendant took specific steps to conceal evidence of the crime, prevent detection and avoid punishment. Defendant's statement to his co-worker that he did not want to know what the guns had been used for further evidenced his sanity at that time. We find that the trial court was not obligated to accept the testimony of

defendant's witnesses in the face of this evidence. We will not disturb the trial court's finding on this issue. The evidence established defendant's sanity at the time of the offenses beyond a reasonable doubt.

■ Defendant finally contends that he was denied a fair hearing and the right to cross-examination when the State failed to show in rebuttal facts it had raised in cross-examination of defendant's expert witnesses. During cross-examination of Dr. Seglin and Dr. Katz, the State suggested that defendant had attempted to set up a false alibi before committing the murders. Questions asked during cross-examination which are based upon or presume facts not in evidence, and are not presented in rebuttal testimony to support the inferences, are improper. (*People v. Nuccio* (1960), 43 Ill. 2d 375, 253 N.E.2d 353; *People v. Giangrande* (1981), 101 Ill. App. 3d 397, 428 N.E.2d 503.) The alibi information was not a fact in evidence at this hearing, nor was it placed in evidence during the State's rebuttal. The questions, therefore, were improper and it was error to allow this questioning on cross-examination. There was no prejudice to defendant, however, because the questions did not alter the witnesses' opinions that defendant was insane at the time he murdered the two victims. (See *People v. Beasley* (1982), 109 Ill. App. 3d 446, 440 N.E.2d 961; *People v. Sparkman* (1979), 68 Ill. App. 3d 865, 386 N.E.2d 346.) Moreover, in a bench trial it is presumed that the trial court considered only competent evidence unless the record affirmatively shows the contrary. (*People v. Alford* (1982), 111 Ill. App. 3d 741, 444 N.E.2d 576.) There is no indication in the record here that the trial court placed any weight on the few questions regarding defendant's alleged attempts to establish a false alibi. Thus, we find that defendant was not denied a fair hearing as a result of the improper cross-examination.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

RIZZI, P.J., and WHITE, J., concur.